IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

SHANE LANCOUR,

                Plaintiff,              OPINION AND ORDER

   v.

                                      20-cv-726-wmc

JIM VERSE, MIKE DEVINE, WILLIAM WOLF,
RYAN SCHLICHT, STEPHANIE GUTH,
MEGAN SCHROEDER, and MARTY GUNDERSON,

                Defendants.

Plaintiff Shane Lancour, who is representing himself, is proceeding on conditions of confinement claims under the Fourteenth Amendment against officers at the La Crosse County Jail, where plaintiff was previously incarcerated. Specifically, plaintiff claims that: (1) defendant Jim Verse implemented a lockout policy of confining prisoners to an overcrowded dayroom, where inmates regularly threatened each other with violence; and (2) defendants Mike Devine, William Wolf, Ryan Schlicht, Stephanie Guth, Megan Schroeder, and Marty Gunderson denied him shower access and clean clothes after another inmate spat blood on him during a fight that occurred in the dayroom on June 24, 2018.[1] Currently pending before the court is defendants' motion for summary judgment on plaintiff's claims, or alternatively, on grounds of qualified immunity. (Dkt. #72.)[2]

---

[1] In February 2024, defendants filed a suggestion of death upon the record as to defendant Mike Devine and proof of service on plaintiff. (Dkt. ##79 and 81.) Since plaintiff has moved to substitute Devine's spouse as a defendant and Devine himself joined in defendants' motion for summary judgment before his death, the court will treat him and his heir as part of that motion for affirmative relief.

[2] Also pending are: plaintiff's renewed motion for court assistance in recruiting counsel to represent him at trial (dkt. #92) and plaintiff's motion to substitute Devine's spouse, Sandy Devine, as a proper party (dkt. #93). Because the court is granting defendants' motion for summary judgment, both of plaintiff's motions will be denied as moot.

The court will grant defendants' motion for summary judgment because no reasonable jury could find that plaintiff was denied his right to due process or that defendants unreasonably responded to plaintiff's conditions of confinement under the Fourteenth Amendment's high standard for such claims, even drawing all reasonable inferences and viewing the evidence in a light most favorable to plaintiff. The court alternatively concludes that defendants are entitled to qualified immunity because it is not yet clearly established that implementing a lockout policy and delaying plaintiff's access to a shower and clean clothing are unconstitutional, at least under the circumstances presented on this record.

## UNDISPUTED FACTS[3]

### A. Background

Plaintiff Shane Lancour, who is currently incarcerated at Kettle Moraine Correctional Institution, was booked into the La Crosse County Jail on May 16, 2018, and housed in Cellblock G during the relevant events at issue in this case. At that time, Cellblock G housed 17 inmates on two levels, with the dayroom on the lower level having tables, televisions, and seating available for all inmates. Inmates were allowed to use the showers in the cellblock at any time unless the cellblock was on lockdown status, during which they still had hand soap, body soap, a washcloth, a bath towel, and a sink with

---

[3] Unless otherwise indicated, the following facts are material and undisputed. The court has drawn these facts from the parties' proposed findings and viewed them and all reasonable inferences in a light most favorable to plaintiff. *See Miller v. Gonzalez*, 761 F.3d 822, 877 (7th Cir. 2014) (At summary judgment, the court must "construe the record in the light most favorable to the nonmovant and avoid the temptation to decide which party's version of the facts is more likely true.").

running water inside their individual cells, although plaintiff avers in his declaration and testified at his deposition that the water in his cell "barely got warm."

During plaintiff's incarceration at the jail, the lockout policy, which was created and implemented in 2012, provided in relevant part that:

- Cell doors shall be opened prior to breakfast each morning. Doors shall remain open until 8:00 a.m.
- At 7:50 a.m., an announcement will be made by the housing officer that headcount will be conducted in 10 minutes.
- At 8:00 a.m., head count begins. Inmates must have their bunks made, gray bins packed, uniforms on, cell doors closed, and standing in the dayroom.
- Inmates will be restricted from entering their cells or dorm areas between the hours of 8:00 a.m. to 1:00 p.m.
- During the times that cell doors are allowed open, they shall be all the way open.
- If inmates wish to lockdown early, they may do so after 9 p.m., the door must be closed and locked.

While defendant Jim Verse is currently the jail captain responsible for overseeing jail operations, he did not take that position until June 2019. During May and June 2018, Verse was an administrative sergeant and was not responsible for overseeing jail operations or creating and implementing the lockout policy. The other defendants are all jail officers.

According to defendant Verse, when inmates are located inside their individual cells, rather than in the dayroom, it is more difficult and time consuming for jailers to conduct inmate counts because jailers have to walk to each individual cell, rather than stand in the dayroom and call the inmate's name. By having inmates in the dayroom instead of in their individual cells in the morning until after lunch, jail staff can also much more quickly and easily find inmates and get them to court appearances, attorney meetings, classes, medical

appointments, and other appointments. Finally, having inmates in the dayroom permits jail staff to confirm the well-being of inmates visually is obviously much quicker and easier than when inmates are in their individual cells.

When a physical altercation occurred inside a cellblock in May 2018, it was standard procedure for jailers to separate the inmates involved by placing the entire cellblock on lockdown status, which required all inmates to return to their individual cells and remain inside. Lockdown status also allows jailers to restore order safely and efficiently, as well as investigate the altercation and prevent additional altercations. While plaintiff cites a *single* instance in which an inmate was allowed to leave his cell during lockdown for a video visit in the dayroom, he admits having no knowledge, experience, certifications, qualifications, credentials, or other evidence regarding the safe, efficient operation of a jail, how many inmates can safely be housed in Cellblock G or any other cellblock, or any applicable standards associated with jail housing.

B. **June 24, 2018, Incident**

Two physical altercations occurred in the dayroom on Sunday, June 24, 2018. The first occurred at 11:54 a.m. and involved two inmates exchanging punches. As a result, Cellblock G was placed in lockdown status, and the two inmates involved in the fight were removed from the cellblock. A second fight occurred between two other inmates at 1:15 p.m., during which time one inmate spat blood and saliva on the other. Because plaintiff was standing near this second fight, some droplets of blood and saliva inadvertently landed on the left side of plaintiff's body, including some specks on his face, in his hair, and on his clothing. In his deposition, plaintiff testified that "[i]t was basically a bunch of little

droplets . . . It wasn't like somebody took a cup of water and threw it at me. But I had little speckles like someone took a paint brush and like ran their thumb across the end of the bristles to throw some paint." (Dkt. #76, at 66-67.)

### C. Plaintiff's Requests for Shower and Clean Clothing

After being hit with these droplets of saliva and blood, plaintiff requested a clean uniform and asked to use the shower located in the dayroom. However, this request was delayed by the jailers need to separate all inmates, complete the lockdown of Cellblock G, and perform a detailed investigation of the second fight to prevent any further altercations. While defendants maintain that plaintiff was told he would receive a clean uniform and access to a shower after the investigation and lockdown, plaintiff represents that defendant Gunderson said that the jailers needed to lock down, so Gunderson was not going to deal with his blood and clothes. After plaintiff returned to his individual cell, he also used the intercom system to request a shower and a new uniform, but defendant Devine and others told him that he could not use the shower located in the dayroom because the cellblock was still on lockdown status. During the lockdown, plaintiff pressed the call button "another 50 times or so" after he spoke with Devine, but neither Devine nor any other officer responded to those calls.[4]

Plaintiff was wearing a clean white t-shirt underneath his uniform shirt, so he removed his uniform shirt. Plaintiff also used the wash rag, sink, water, and soap located in his individual cell to clean his body and face, and he rinsed his mouth out with water.

---

[4] Although plaintiff's proposed findings of fact do not identify the unresponsive officers, plaintiff testified in his deposition that *all* of the defendants were directly involved and none responded to his requests for assistance or took any action to help him clean up.

Administrative sergeants and captains also told plaintiff that he would be seen by medical service providers. After the lockdown ended five and a half hours later, plaintiff was allowed to take a shower and obtained a new uniform. Although plaintiff was repeatedly denied a shower and clean clothing during the lockdown, the jailers allowed another inmate to leave his cell for a video visit on a kiosk located in the dayroom.

### D. Post-Incident Care

Plaintiff was taken to the hospital on three different occasions for blood tests. Although plaintiff thought he had contracted Hep-C after his initial blood test, he did not contract any disease, need any medical treatment, or suffer any other physical injury as a result of the June 24, 2018, incidenct. Nonetheless, plaintiff claims that he sustained physical, mental, and emotional injury after being struck with the other inmate's blood and exposed to potential disease. Plaintiff also says that he later received a response from a sergeant who agreed that five and a half hours was too long to wait for a clean uniform.

## OPINION

Summary judgment is appropriate if the moving party shows that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). If the moving party meets this burden, then the non-moving party must provide evidence "on which the jury could reasonably find for the nonmoving party" to survive summary judgment. *Trade Fin. Partners, LLC v. AAR Corp.*, 573 F.3d 401, 406-407 (7th Cir. 2009) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)). In deciding whether to grant summary judgment, the court views all facts and

draws all inferences in the light most favorable to the nonmoving party. *Anderson*, 477 U.S. at 255.

Generally, a court also construes the filings of unrepresented parties like plaintiff generously. *See Anderson v. Hardman*, 241 F.3d 544, 545 (7th Cir. 2001) (noting that courts "construe *pro se* filings liberally"). However, the Seventh Circuit has repeatedly referred to summary judgment as the "put up or shut up" moment for parties seeking to take their claims to trial, even for *pro se* litigants. *Johnson v. Cambridge Indus. Inc.*, 325 F.3d 892, 901 (7th Cir. 2003) (citation omitted). Specifically, plaintiff must "do more than simply show that there is some metaphysical doubt as to the material facts"; he must respond to defendants' showing of a lack of material disputes of fact by designating specific facts in affidavits, depositions, answers to interrogatories or admissions that establish a genuine, triable issue. *Anderson*, 477 U.S. at 256-57, 261. And because those facts must be admissible at trial, plaintiff may not rely on inadmissible hearsay, speculation, or conclusory allegations to defeat summary judgment. *See Prude v. Meli*, 76 F.4th 648, 661 (7th Cir. 2023); *Gorbitz v. Corvilla, Inc.*, 196 F.3d 879, 882 (7th Cir. 1999). Finally, a factual dispute can preclude summary judgment only if the facts "might affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at 248.

Because plaintiff was a pretrial detainee at the time of the alleged incident on June 24, 2018, his conditions of confinement claims are governed by the objective reasonableness standard found in the Due Process Clause of the Fourteenth Amendment. *Kingsley v. Hendrickson*, 576 U.S. 389 (2015). *Hardeman v. Curren*, 933 F.3d 816, 821-22 (7th Cir. 2019); *Caldwell v. Woock*, No. 18-cv-1074-wmc, 2023 WL 3582349, at *4 (W.D. Wis. May 22, 2023). Under this standard, plaintiff must show that (1) the conditions in

question are or were "objectively serious"; (2) defendants acted "purposefully, knowingly, or recklessly with respect to the consequences of [their] actions"; and (3) defendants' actions were "objectively unreasonable -- that is, 'not rationally related to a legitimate governmental objective or . . . excessive in relation to that purpose.'" *Hardeman*, 933 F.3d at 827 (Sykes, J., concurring) (quoting *Kingsley*, 576 U.S. at 398). In determining whether plaintiff has met this burden, the court looks to the totality of the circumstances, including the "duration and severity" of plaintiff's exposure to the alleged unconstitutional conditions. *Id*. at 824; *see also Mays v. Dart*, 974 F.3d 810, 819 (7th Cir. 2020) ("[O]bjective reasonableness turns on the facts and circumstances of each particular case.").

While the *Hardeman* court found that allegations of physical illnesses and appallingly unsanitary conditions brought on by a three-day, jail-wide water shutoff met this standard, 933 F.3d at 824, it did not specify exactly how severe or long the deprivation must be to implicate the due process clause, *Caldwell*, 2023 WL 3582349, at *4; *Est. of Nottestad by Clark v. La Crosse Cnty*., No. 21-cv-535-jdp, 2022 WL 17583798, at *5 (W.D. Wis. Dec. 12, 2022). In more recent decisions addressing this objective component under the Fourteenth Amendment, however, the Seventh Circuit has essentially applied a rough equivalent to that of the Eighth Amendment standard. *See Caldwell,* 2023 WL 3582349, at *4 (citing *Thomas v. Dart*, 39 F.4th 835, 841 (7th Cir. 2022) (applying substantial risk of serious harm standard to failure-to-protect claim); *Williams v. Ortiz*, 937 F.3d 936, 942 (7th Cir. 2019) (applying serious medical need for a medical care claim)). Regardless, to avoid summary judgment, plaintiff must at minimum present evidence sufficient to permit a reasonable jury to conclude that: the lockout policy subjected him to a substantial risk

of serious harm (claim no. 1); he was subjected to significant and long-lasting unhygienic conditions during the lockdown on June 24, 2018 (claim no. 2); and defendants responded in an objectively unreasonable manner in both instances.

Based on the undisputed facts, defendants seek summary judgment on four grounds: (1) the conditions of plaintiff's confinement were not severe enough to implicate his due process rights; (2) defendants' responses were not objectively unreasonable; (3) plaintiff did not suffer injury because of the conditions of confinement; and (4) defendants are entitled to qualified immunity. For the reasons explained below, the court finds all of defendants' arguments persuasive. Indeed, even construing the evidence of record in his favor and considering the totality of the circumstances, no reasonable jury could find that the undisputed conditions to which plaintiff was subjected for approximately 5½ hours, nor defendants' actions under those circumstances, violated plaintiff's due process rights under the Fourteenth Amendment. In any event, defendants are entitled to qualified immunity.

## I. Dayroom Lockout Policy

Plaintiff's broadest claim is that then Administrate Sergeant Verse implemented a policy of confining prisoners to an overcrowded dayroom where inmates regularly threatened each other with violence, causing plaintiff to be spat on twice -- once with blood -- and assaulted. However, plaintiff's claim fails for three reasons. *First*, it is undisputed that Verse had no personal involvement in adopting or implementing the 2012 lockout policy in place before or during the events in question in this case. To the contrary, Verse did not become the Jail Captain until June 2019, almost a year after plaintiff experienced

9

lock outs in 2018. *See Gonzalez v. McHenry Cnty., Illinois*, 40 F.4th 824, 828 (7th Cir. 2022) (Section 1983 lawsuits "require personal involvement in the alleged constitutional deprivation to support a viable claim.").

*Second*, even if Verse could be held responsible for condoning the policy as an administrative sergeant, or if plaintiff had named the correct jail administrator as a defendant, plaintiff has presented *no* evidence apart from his own vague allegations that the dayroom was overcrowded and forced volatile inmates to interact with one another. While plaintiff generally refers to complaints he made about the "issues" that he and other inmates had with the lockout policy, and attaches copies of "General Request" forms he submitted to jail staff (dkt. #87-1), neither he nor the forms detail exactly how the lockout policy exposed him to a substantial risk of serious harm. For example, even though plaintiff submitted a 34-page exhibit consisting of numerous complaints he made about his cell assignment, cleaning and maintenance problems, and staff disrespecting him, the *only* mention he makes of the lockout policy in particular is the following:

> I would appreciate if the administrators of the jail would consider changing the policy in regards to inmates being locked out of their cells in the mornings. Inmates are forced to be housed around other people who have mental health issues which in turn tend to make individuals violent. These individuals cause animosity among others which creates a hazardous living situation. . .

(Dkt. 387-1, at 19.)

While a jury could reasonably infer that lockouts place inmates in closer proximity to each other for longer periods of time, and find two, actual altercations occurred in June of 2018, a jury could *not* reasonably infer from this scant evidence that the conditions in the dayroom during lockouts were so serious, that plaintiff in particular faced a substantial

10

risk of harm, much less that the jailers acted unreasonably in implementing the lockout policy. Indeed, on its face, there is nothing obviously dangerous about a policy forcing inmates into the dayroom for several hours at a time. *Taylor v. La Crosse Cnty.*, No. 19-cv-678-jdp, 2021 WL 231068, at *6 (W.D. Wis. Jan. 22, 2021) (finding same with respect to similar policy).

In fact, inmates must routinely interact with each other in common spaces, such as at meal times or during recreational periods. Moreover, the county has identified efficiencies and safety interests for implementing a lockout policy that plaintiff has not disputed, and it has instituted other policies to address any altercations that may arise, including separating fighting or arguing inmates and placing the cellblock on lockdown status. *Id.* (noting significance of policy's purpose and other policies to address problems). Finally, it is undisputed that in June 2018, the jailers acted quickly to separate fighting inmates and place the cellblock in lockdown to keep plaintiff and the other inmates safe.

*Third*, even if plaintiff's challenge to the lockout policy could survive summary judgment on the merits, any potential defendant is entitled to qualified immunity. Under the doctrine of qualified immunity, a plaintiff may not obtain damages from a defendant for a constitutional violation unless the plaintiff shows not only that the defendant violated his rights, but also that his rights were "clearly established" at the relevant time. *City of Escondido, Cal. v. Emmons*, 586 U.S. 38, 42 (2019). Plaintiff can meet this burden by pointing to either: (1) a closely analogous, binding case decided in his favor; or (2) a more general constitutional rule that applies "with obvious clarity" to defendants' particular conduct. *Cibulka v. City of Madison*, 992 F.3d 633, 639-40 (7th Cir. 2021). Plaintiff has been unable to cite *any* authority -- and the court is also unaware of any -- clearly

11

establishing that prison officials violate the Fourteenth Amendment merely by implementing a lockout policy.

Instead, this court has identified only two cases -- both summary judgment decisions from this court -- that involved a lockout policy, and in both cases, the issue was whether the policy exacerbated an inmate's long-identified medical condition. *See Taylor*, 2021 WL 231068, at *2 (jury could conclude that defendants knew that lockout policy exacerbated pain and bleeding of plaintiff's internal hemorrhoids because dayroom had no cushioned chairs or surfaces for plaintiff to sit on); *Spangler v. Pittman*, No. 16-CV-312-JDP, 2018 WL 3611947, at *4-5 (W.D. Wis. July 27, 2018) (jury could conclude that lockout policy caused plaintiff severe pain because plaintiff filed numerous grievances about his medical needs (chronic back pain requiring use of cane) "in connection with the lockout policy with remarkable persistence"). Of course, however traumatizing the general circumstances during a lockout or even during the events of June 24, 2018, may have been, plaintiff here has identified no special need or condition, nor any evidence that defendants were aware of any such need. As importantly, plaintiff offers *no* evidence that any defendant was aware of such a condition. Thus, plaintiff has not shown that a reasonable jail officer would know that implementing a lockout policy under the circumstances in this case would violate the Fourteenth Amendment. *See Doxtator v. O'Brien,* 39 F.4th 852, 863 (7th Cir. 2022) ("[R]ight is 'clearly established' for qualified immunity purposes if its 'contours were sufficiently definite that any reasonable official in the defendant's shoes would have understood that he was violating it,'" and "clearly established law share[s] specific details with the facts of the case at hand.") (citing *White v. Pauly*, 580 U.S. 73 (2017) and quoting *Plumhoff v. Rickard*, 572 U.S. 765, 778 (2014)).

## II. Denial of Shower and Clean Clothes

Plaintiff claims more specifically that after a prisoner fight resulting in his being splattered with blood droplets on June 24, 2018, defendants Devine, Wolf, Schlicht, Guth, Schroeder, and Gunderson denied him access to a shower and clean clothes for five and a half hours, forcing plaintiff to eat dinner still covered in another human's blood. However, it is undisputed that plaintiff was exposed only to droplets of bloody saliva and was immediately able to remove his soiled shirt and clean himself by using soap, running water, a washcloth, and a towel in his cell. While plaintiff complains that the water in his cell was only lukewarm, the fact that plaintiff was not able to clean himself as well as he would have liked or change into a completely fresh set of clothes for a period of five and a half hours, however unpleasant, simply does not rise to the level of severity found appalling or unsanitary in conditions of confinement cases allowed to proceed past summary judgment. *See Self v. Bergh*, 835 Fed. Appx. 873 (7th Cir. 2020) (no constitutional violation where inmate covered in blood and pepper spray denied shower for one day and new uniform for two days); *Conway v. Henze*, 2000 WL 34230125, at *16 (W.D. Wis. 2000) ("Regardless whether plaintiff received a shower nine days or one month after his arrival at the jail, he was not deprived of the ability to clean himself; his holding cell had a wash basin with hot and cold water."); *see also Harris v. Jones*, 2021 WL 4950248, at *2 (7th Cir. Oct. 25, 2021) (no Eighth Amendment violation where inmate who urinated in his clothing forced to wait one day for soap and clean underclothes and three days for clean jumpsuit and shower); *Davenport v. DeRobertis*, 844 F.2d 1310, 1316-17 (7th Cir. 1988) (one shower per week is sufficient under Eighth Amendment).

Moreover, it is undisputed that there were legitimate safety, security, and efficiency reasons for not immediately granting plaintiff's request for a new uniform or a shower. Two, separate altercations between inmates had occurred in the cellblock that day, and defendants used the five and a half hours to separate and calm the inmates, investigate the cause of the fights, and prepare their reports, all consistent with jail policy. *See Funderburgh v. Kuenzli*, 2023 WL 6389306, at *3 (N.D. Ind. 2023) ("[B]eing denied a shower for a single day due to a lockdown doesn't rise to the level of [an Eighth Amendment] violation."); *Torres v. Milwaukee Cnty. Jail*, 2015 WL 3872325, at *3 (E.D. Wis. 2015) (dismissing claim that lack of showers during five-day lockdown violated Fourteenth Amendment). Here, it is undisputed that defendants provided plaintiff with shower access, a clean uniform, and medical services as soon as the lockdown was lifted.

Finally, plaintiff has identified no physical injury that resulted from his arguable five-hour long exposure to droplets of blood and saliva, nor has he identified any more than generalized psychological distress from a fear that he might have contracted disease through his exposure to bodily fluids. *See Caldwell*, 2023 WL 3582349, at *7 (concluding same where inmate housed near clogged toilet and had limited access to water for *seven* days because sink in his cell was broken). For all these reasons, defendants are entitled to summary judgment on plaintiff's claim that the denial of a shower and clean clothing for five and a half hours following a splattering of blood and saliva were unconstitutional.[5]

---

[5] Even if defendants violated plaintiff's Fourteenth Amendment rights, they are entitled to qualified immunity because plaintiff has again identified no analogous case that establishes a reasonable officer would know that denying him shower access and clean clothing under the circumstances of this case would violate the Fourteenth Amendment, nor is the court aware of such a case.

ORDER

IT IS ORDERED that:

1) Defendants' motion for summary judgment (dkt. #72) is GRANTED.

2) Plaintiff's motions for court assistance in recruiting counsel (dkt. #92) and to substitute a proper party (dkt. #93) and defendants' motion to amend briefing schedule (dkt. #103) are DENIED as moot.

3) The clerk of court is directed to enter judgment in favor of defendants and close this case.

Entered this 25th day of June, 2024.

BY THE COURT:

/s/

_____
WILLIAM M. CONLEY
District Judge